Opinion issued December 22, 2020



In The

# Court of Appeals

For The

# First District of Texas

_____

## NO. 01-18-00088-CV

_____

**SUSTAINABLE TEXAS OYSTER RESOURCE MANAGEMENT, L.L.C.,**
**Appellant**

**V.**

**HANNAH REEF, INC., SHRIMPS R US, INC., IVO SLABIC,**
**AND MICHAEL IVIC, Appellees**

---

**On Appeal from the 56th District Court**
**Galveston County, Texas**
**Trial Court Case No. 15-CV-0772**

---

## O P I N I O N

The dispute in this case arose after the Chambers–Liberty Counties Navigation District ("Navigation District") issued a Coastal Surface Lease to Sustainable Texas Oyster Resource Management, L.L.C. ("STORM") in 2014,

authorizing STORM to cultivate and harvest oysters on 23,000 acres of submerged land in Galveston and Trinity Bays. The lease purported to give STORM the exclusive right to engage in oyster-production activities on the submerged land and authorized STORM to protect the submerged land from trespassers in the same manner as a freeholder of the land.

At the time the Navigation District issued the Coastal Surface Lease to STORM, parts of the 23,000 acres covered by the lease were already subject to six oyster-production permits, known as "certificates of location," and accompanying oyster leases issued by the Texas Parks and Wildlife Department ("TPWD") to oystermen (1) Hannah Reef, Inc., (2) Shrimps R Us, Inc. (3) Ivo Slabic, and (4) Michael Ivic ("the Oystermen"). The certificates of location and accompanying oyster leases authorized the Oystermen to plant and construct private oyster beds on the submerged land identified in each certificate of location. The Oystermen also possessed permits and licenses issued by the TPWD, authorizing the Oystermen to harvest oysters from naturally-occurring oyster reefs located within public fishing grounds, which also lie within the boundaries of STORM's lease.

After STORM began to treat the Oystermen as trespassers, litigation ensued between the parties regarding which had the right to cultivate and harvest oysters in the areas of Galveston and Trinity Bays covered by STORM's Coastal Surface Lease. At the heart of the dispute was whether the Navigation District had the legal

2

authority to grant STORM the Coastal Surface Lease, purporting to give STORM the exclusive right to engage in oyster-production activities on the submerged land covered by the lease, or whether the TPWD had the exclusive authority to regulate oyster-production activities, including the exclusive authority to grant the right to cultivate and harvest oysters on land submerged beneath Texas waters. Stephen Hillman, who claimed to have a TPWD license to fish and harvest oysters in the public waters that lie within the boundaries of the Coastal Surface Lease, later joined the suit, aligning with the Oystermen.

In a pre-trial partial summary-judgment order, the trial court rendered declaratory relief requested by the Oystermen, declaring that (1) the TPWD had the exclusive authority to regulate the cultivation and harvesting of oysters; (2) the Navigation District did not have the legal authority to issue the Coastal Surface Lease to STORM; and (3) the Coastal Surface Lease was void and unenforceable against the Oystermen's rights. The trial court also declared that the Oystermen were not trespassers as a matter of law and ordered STORM to take nothing on its counterclaims.

The trial court determined that the Oystermen were entitled to recover attorney's fees from STORM under the Declaratory Judgments Act. *See* TEX. CIV. PRAC. & REM. CODE § 37.009 (providing that "court may award costs and reasonable and necessary attorney's fees as are equitable and just" in declaratory-judgment

proceeding). The issue of reasonable and necessary attorney's fees was tried to a jury, and the trial court rendered judgment on the jury's verdict, awarding the Oystermen $417,000 in attorney's fees for the trial-court proceedings and additional sums totaling $75,000 for conditional appellate attorney's fees. The final judgment also ordered that the Oystermen take nothing on their claim for trespass to try title, and it incorporated a nonsuit without prejudice filed by Hillman.

Among its challenges on appeal, STORM contends that trial court erred in declaring that the Navigation District had no legal authority to issue the Coastal Surface Lease to STORM, and it asserts that the Oystermen improperly prosecuted their case under the Declaratory Judgments Act. STORM also challenges the trial court's take-nothing summary judgment on its trespass and related counterclaims and disputes the award of attorney's fees on several grounds, including failure to segregate the fees. STORM further contends that the trial court erred by permitting Hillman to nonsuit his claims after trial. Finally, STORM requests that we reconsider a venue ruling made in an earlier interlocutory appeal in this case.

We agree with STORM that, because the Oystermen did not segregate their attorney's fees between claims on which attorney's fees may be recovered and those for which they may not, the portion of the judgment awarding attorney's fees should be reversed, and the attorney's fees issue remanded to the trial court for a new trial.

We reject STORM's other arguments and affirm the remainder of the trial court's judgment.

## Background

### A.    Historical Facts

The Texas Legislature created the Chambers–Liberty Counties Navigation District in 1944. *Chambers-Liberty Ctys. Navigation Dist. v. State*, 575 S.W.3d 339, 342 (Tex. 2019). The Navigation District operated as a navigation district authorized by Article XVI, Section 59 of the Texas Constitution and Chapter 62 of the Texas Water Code. *Id.* In 1974, the Navigation District converted into a "self-liquidating district," operating under Chapter 63 of the Water Code. *See* TEX. WATER CODE §§ 63.021(a), 63.022.

In 1957 and 1967, the State of Texas conveyed land submerged by the waters in and around Galveston Bay to the Navigation District. The submerged land, located in Chambers and Galveston Counties, was conveyed by a series of land patents. The conveyances were authorized by Texas Revised Civil Statutes article 8225 (1925), which provided, in part, as follows:

> Any Navigation District heretofore or hereafter organized under this title or any General Law under which said subdivision may be created shall have the right to purchase from the State of Texas any lands and flats belonging to said State, covered or partly covered by the waters of any of the bays or other arms of the sea to be used by said District for the purposes authorized by law with the right to dredge out or to fill in and reclaim said lands or otherwise improve the same . . . .

*Chambers-Liberty Ctys. Navigation Dist.*, 575 S.W.3d at 342 (setting out text of article 8225).

From 1975 to 1989, the TPWD issued six certificates of location and accompanying oyster leases to private parties, permitting those parties to establish private oyster beds on the submerged land described in the certificates. These six tracts of submerged land lie within the land transferred to the Navigation District by the State of Texas in 1957 and 1967. Over time, the six certificates of location and oyster leases was transferred to different private parties. By 2014, the six certificates of location and oyster leases were held by the four Oystermen. Hannah Reef and Michael Ivic each held two certificates of location. The submerged land included in those four certificates of location was in Galveston County. Shrimps R Us and Ivo Slabic each held one certificate of location. The submerged land covered by those two certificates was in Chambers County.

On April 14, 2014, the Navigation District entered into a Coastal Surface Lease with STORM. The Coastal Surface Lease granted STORM the exclusive right, for a period of 30 years, to cultivate and harvest oysters on approximately 23,000 acres of submerged land in Galveston and Trinity Bays. The Coastal Surface Lease stated that ownership of the submerged land was conveyed to the Navigation District by the State of Texas by patents in 1957 and 1967. The tracts of submerged land

6

subject to the six certificates of location and oyster leases held by the Oystermen was within the 23,000 acres covered by the Coastal Surface Lease.

On August 5, 2014, STORM sent a letter to the Oystermen entitled "No Trespass Notice" and "No Unauthorized Oyster Activities Notice." The letter notified the Oystermen as follows:

> This letter is written notice to you that [STORM] is the Lessee of the land described in the referenced Coastal Surface Lease from [the Navigation District]. [The Navigation District] obtained fee simple title to the land from the State of Texas by . . . Letters Patent. The land is located along the shore of Trinity-Galveston-West-East Bay and is generally submerged land.
>
> . . . .
>
> [The Navigation District] acquired fee simple title to the land in 1957 & 1967. Pursuant to the Coastal Surface Lease, STORM has the superior right to use and possession of the land under [the Navigation District's] fee simple title for oyster purposes. . . .
>
> The right to plant, cultivate and grow oysters on this land is inherent in [the Navigation District's] fee title to the land; a right now leased to STORM. It has come to STORM's attention that you might be engaged in or about to engage in oyster activities on the land that conflict with STORM's property rights and the Coastal Surface Lease. Be advised that under the Coastal Surface Lease, you may not engage in oyster activities upon the land without STORM's consent. Likewise, under the Texas Parks & Wildlife Code, you may not catch by any means or method or possess an oyster on this land without STORM's consent. . . .
>
> Any claim that the State of Texas has the right to authorize you to trespass upon the land is without merit.

TAKE NOTICE that you do not have STORM's consent to engage in oyster activities on the land. If you engage in oyster activities on the land, or interfere with STORM's rights to use and possession of the land, TAKE NOTICE that STORM will enforce its rights against trespassing and trespassers to the fullest extent of the law.

The letter was signed by STORM's principal, Tracy Wood.

## B.    Trial Court Proceedings and Interlocutory Appeal

On July 24, 2015, the Oystermen filed suit against STORM in Galveston County District Court, asserting claims to quiet title, for trespass to try title, and for tortious interference with prospective business relations. The Oystermen also sued under the Declaratory Judgments Act, seeking declaratory relief. In addition, the Oystermen requested injunctive relief as well as monetary damages and attorney's fees.

STORM answered, generally denying the Oystermen's claims. STORM also filed a motion to transfer venue to Chambers County. STORM asserted venue was mandatory in Chambers County for Shrimps R Us's and Slabic's claims because the certificates of location and oyster leases held by those two parties involved submerged land located in Chambers County.

The Oystermen responded to the motion, arguing that venue was proper in Galveston County for Shrimps R Us's and Slabic's claims because there was an "essential need" for those claims to be decided in Galveston County District Court, where the suit was pending. The Oystermen also amended their petition, filing their

Fourth Amended Petition. They continued to pursue claims to quiet title, for trespass to try title, and for tortious interference. The Oystermen maintained that their oyster leases were valid and that the Coastal Surface Lease, which covered areas including not only the Oystermen's six oyster leases, but also public fishing grounds, was invalid. The Oystermen asserted that the TPWD "has the sole authority to issue leases (along with certificates of location) authorizing persons to plant oysters and make a private oyster bed in the public waters of the State." They alleged that the Navigation District did not "have any legal authority to lease the submerged lands for purposes of cultivating or harvesting oysters."

The Oystermen requested the trial court to enjoin STORM "from seeking enforcement of [the Coastal Surface Lease] against [the Oystermen], in any manner, and interfering with [the Oystermen's] use and enjoyment of their property covered by their leases with the State." The Oystermen also requested the trial court to determine whether STORM, by way of the Coastal Surface Lease, could limit the Oystermen's right to harvest oysters from public fishing grounds that lie within the lease's boundaries. The Oystermen asserted that the TPWD "has the sole authority to issue commercial oyster fishermen's licenses to persons desiring to take oysters from public waters of the State." The Oystermen indicated that they each have licenses, issued by the TPWD, to harvest oysters in the public fishing areas of

Galveston Bay. The Oystermen further sought "declaratory relief that [the Coastal Surface Lease] in no way prohibits their ability to fish for oysters in public waters."

The Oystermen also requested monetary damages for their tortious interference claim. They alleged that STORM had engaged "in harassing conduct" by navigating "their boats so close to [the Oystermen's] boats that at least one was forced aground." They alleged that STORM had been "following and filming one or more of [the Oystermen's] crews for purposes of intimidation, to frustrate [the Oystermen's] attempts to relocate oysters in danger of dying as a result of the Memorial Day floods in the Galveston Bay area." The Oystermen alleged that, because of STORM's conduct, they were not able "to rescue and relocate various beds of oysters." They claimed that "those oysters died resulting in a loss of revenue." The Oystermen further claimed that STORM's conduct was "exacerbated by its public statements to the effect that [the Oystermen] were 'stealing' STORM's oysters."

The Oystermen requested a temporary injunction "to prevent [STORM] from acting pursuant to an invalid lease, including the exclusion of [the Oystermen] from the property at issue and/or interference with [the Oystermen's] quiet use and enjoyment of such property." The Oystermen further sought to restrain "STORM from interfering with their right to fish for oysters in public waters STORM now alleges it controls."

Following an evidentiary hearing, the trial court granted the Oystermen's request for a temporary injunction. The temporary-injunction order provided,

> The Court finds and concludes that [the Oystermen] hold leases and certificates of location issued by the Texas Parks and Wildlife Department . . . authorizing [the Oystermen] to plant and harvest oyster beds in Galveston Bay, as well as licenses to fish for oysters in the public waters of the State.

> The Court finds and concludes that STORM, in reliance on [the Coastal Surface Lease], intends to restrict access by [the Oystermen] to the approximately 23,000 acres covered by the [Coastal Surface Lease], which includes areas covered by [the Oystermen's] leases and certificates of location, and public waters that [the Oystermen] are otherwise licensed to fish in.

The trial court ordered STORM to refrain from entering the Oystermen's leaseholds and "from hunting, catching, transplanting, or disturbing" the oysters in the leaseholds. STORM was also restrained "from prohibiting, preventing, or limiting [the Oystermen's] access to and use of the area covered by the [Coastal Surface Lease], pursuant to licenses issued by the [TPWD]." STORM was further restrained "from interfering with, harassing, or disrupting [the Oystermen's] oyster fishing activities or the oyster fishing activities of any duly licensed oyster fisherman."

After granting the temporary injunction, the trial court denied STORM's motion to transfer venue of Shrimps R Us's and Slabic's claims to Chambers County. STORM filed an interlocutory appeal challenging the order. *Sustainable Tex. Oyster Res. Mgmt. L.L.C. v. Hannah Reef, Inc.*, 491 SW.3d 96 (Tex. App.—

11

Houston [1st Dist.] 2016, pet. denied). On appeal, Shrimps R Us and Slabic asserted that there was an "essential need" for their claims to be tried in Galveston County along with the other two Oystermen's claims because transferring all or part of their claims to Chambers County could result in inconsistent judgments between the two counties. *Id.* at 109. They pointed out that the validity of the Coastal Surface Lease was a central issue to all claims being asserted and that Galveston County was the proper venue for the Oystermen's declaratory-judgment claim regarding whether STORM had the right under the Coastal Surface Lease to exclude licensed oyster fishermen from public fishing areas within the lease. *Id.* at 109–10. Shrimps R Us and Slabic asserted that a determination of the declaratory-judgment claim in Galveston County could be detrimental to the prosecution of their oyster-lease claims if those claims were transferred to Chambers County. *Id.* at 110.

We agreed with STORM that, to prove their trespass-to-try-title claims, the Oystermen were required to recover on the strength of their own title and not rely on the weakness of STORM's title. *Id.* But we disagreed with STORM's assertion that the declaratory-judgment claim regarding whether STORM had the right under the Coastal Surface Lease to exclude licensed oyster fishermen from the public fishing areas did not have the potential to affect the trespass-to try-title claims. *Id.*

We determined that Shrimps R Us and Slabic had shown that it was "indispensably necessary for them to litigate all of their claims in Galveston County"

12

because there was "the potential for inconsistent judgments if Shrimps R Us's and Slabic's claims were transferred to Chambers County" and given "the possible preclusive effect of the declaratory judgment as to the validity of STORM's Coastal Surface Lease on trying issues in Chambers County that were previously litigated by the same parties in Galveston County." *Id.* at 112. We concluded that Shrimps R Us and Slabic had "established an essential need to have their claims tried in Galveston County District Court where the suit is pending." *Id.* We held that the trial court had not erred when it denied STORM's motion to transfer venue, and we affirmed the trial court's order denying the motion. *Id.*

In the trial court, STORM filed a counterclaim against the Oystermen, asserting claims for trespass, conversion, money had and received, and accounting. STORM's claims were based on its assertion that the Navigation District, not the TPWD, had the legal authority to lease for oyster production the 23,000 acres of submerged land conveyed to the Navigation District by the State of Texas in 1957 and 1967. STORM asserted that the Navigation District's legal authority to lease the submerged land for oyster production derived from the State's conveyances of the property by land patents to the Navigation District and from provisions of the Texas Water Code governing navigation districts. STORM claimed that the Navigation District had the legal authority to issue the Coastal Surface Lease to STORM in 2014, but the TPWD had no legal authority to issue, from 1975 to 1989, the

13

certificates of location and oyster leases held by the Oystermen that lie within the Coastal Surface Lease's boundaries. STORM asserted that the Coastal Surface Lease gave it "exclusive possession" of the submerged land "to use, create, manage, possess, cultivate and control oyster beds." STORM claimed that the Oystermen were trespassing on STORM's property when the Oystermen entered the areas covered by the certificates of location to engage in oyster-production activities. STORM also claimed that, by harvesting oysters within the boundaries of their certificates of location, the Oystermen had wrongfully taken and damaged its property.

The Oystermen filed a motion for partial summary judgment. They argued that the Coastal Surface Lease was invalid as a matter of law because the Texas Wildlife Conservation Act gave the TPWD exclusive authority to regulate oyster-production activities in Texas. The Oystermen asserted that the Navigation District is governed by the Water Code, which enables the Navigation District "to improve waters for purposes of navigation" but does not empower it to issue private oyster leases. The Oystermen requested that, pursuant to the Declaratory Judgments Act, the trial court declare that the Coastal Surface Lease was void and unenforceable against the Oystermen and dismiss STORM's counterclaims.

STORM filed a combined response to the Oystermen's motion and a countermotion for summary judgment. STORM asserted that it was entitled to

14

summary judgment on its counterclaims for trespass and related causes of action. STORM continued to claim that the Navigation District had the legal authority to issue the Coastal Surface Lease to STORM. It asserted that the Navigation District had received fee simple title to the submerged land from the State and that the Navigation District had statutory authority under the Water Code. STORM also argued that the Oystermen were not entitled to a declaratory judgment because "Texas courts have long held that the Declaratory Judgments Act may not be used to settle issues regarding title to real property because such lawsuits are properly brought as trespass to try title actions." In its reply, the Oystermen countered that a request for declaratory relief was appropriate because the Coastal Surface Lease affected "not only [the Oystermen's] certificates of location issued by [the TPWD], but also the rights of [the Oystermen] to harvest oysters on public reefs during the public oyster season."

On September 28, 2016, the trial court signed an order denying STORM's countermotion for summary judgment. On the same day, the trial court granted partial summary judgment in the Oystermen's favor. The court granted Oystermen's requested relief under the Declaratory Judgments Act and ordered that STORM take nothing on its counterclaims. In the partial summary judgment order favoring the Oystermen, the trial court ruled:

[T]he Court DECLARES as follows:

a. Texas Parks and Wildlife Department has the exclusive authority to control the planting and harvesting of oysters;

b. Chambers-Liberty Counties Navigation District . . . has no legal authority to regulate oysters;

c. [The Navigation District] did not have legal authority under the State Constitution or under State law to enter into the Coastal Surface Lease with Sustainable Texas Oyster Resource Management, L.L.C. ("STORM"), effective April 15, 2014; and

d. The Coastal Surface Lease between [the Navigation District] and STORM, effective April 15, 2014, is null and void and is unenforceable against [the Oystermen's] rights and privileges granted by fishing and oystering licenses, leases, and permits issued by the State of Texas.

The Court further DECLARES that as to every counterclaim asserted by STORM in its live pleading, Plaintiffs [the Oystermen] are not trespassers as a matter of law, precluding relief to STORM by that counterclaim. It is therefore ORDERED that Defendant STORM's claims of trespass, conversion, money had and received, accounting, and request for injunctive relief are DISMISSED WITH PREJUDICE and that STORM shall take nothing by its counterclaims against Plaintiffs Hannah Reef, Inc., Shrimps R Us, Inc., Ivo Slabic and Michael Ivic.

It is further ORDERED, ADJUDGED and DECREED that Plaintiffs Hannah Reef, Inc., Shrimps R Us, Inc., Ivo Slabic and Michael Ivic shall recover from Defendant STORM their reasonable and necessary attorney fees and costs under [the Declaratory Judgments Act] Tex. Civ. Prac. & Rem. Code § 37.009. The Court shall set a date for submission of evidence in support of and controverting an award of attorney's fees, as are equitable and just, by further Order.

At the time the trial court signed the order, the Oystermen's Sixth Amended Petition was their live pleading. Stephan Hillman had joined the Oystermen as a plaintiff in the Fifth Amended Petition. Hillman was described as "the owner of

Hillman Guide Service and holds a sports fishing license issued by the [the TPWD], allowing him to fish and harvest oysters in the public waters of Galveston Bay, Texas." Tracy Woody and Jeri's Seafood were also added as defendants in the Fifth Amended Petition and remained defendants in the Sixth Amended Petition. The pleadings alleged that Woody was STORM's principal and that Jeri's Seafood was "a retail and wholesale business that sells oysters" managed by Woody.

The Sixth Amended Petition also contained a new cause of action: conspiracy in restraint of trade. The new claim involved allegations that the Navigation District had conspired with STORM, Woody, and Jeri's Seafood to enter into the Coastal Surface Lease "to exclude Plaintiffs and others from harvesting oysters in 23,000 acres of Trinity and Galveston Bays and eliminating those in competition with Jeri's Seafood."

The order granting the Oystermen's motion for partial summary judgment stated that Hillman "continued his prosecution of the [motion for partial summary judgment] to a later date and subject to other orders of the Court." The Oystermen stated on the record at the summary-judgment hearing that the motion was not asserted against defendants Woody and Jeri's Seafood, and the Oystermen later nonsuited their claims against those two defendants.

The case was called for a jury trial on November 13, 2017. The live pleading, the Tenth Amended Petition, alleged causes of action for quiet title and trespass to

17

try title. The previously pleaded tort claims of tortious interference and conspiracy had been abandoned in the Seventh Amended Petition. Damages were no longer pleaded, but the petition continued to request declaratory and injunctive relief along with attorney's fees pursuant to the Declaratory Judgments Act.

At the start of trial, the Oystermen informed the trial court that they were not pursuing their claims for quiet title and trespass to try title, indicating to the trial court that the declaratory relief granted in the earlier partial summary judgment order had given them adequate relief. And the only issue remaining for trial was the amount of reasonable and necessary attorney's fees the Oystermen were entitled to recover under the Declaratory Judgments Act.

In support of the attorney's fees request, one of the Oystermen's attorneys testified as their attorney's fees expert. He opined that that the reasonable and necessary attorney's fees incurred by the Oystermen since the suit was filed was $417,000. The Oystermen offered billing records to support the requested fees. The Oystermen's attorney also provided testimony to support an award of appellate attorney's fees.

On cross-examination, STORM asked the Oystermen's attorney whether he had segregated the attorney's fees between claims on which attorney's fees may be recovered and those for which they may not. The attorney responded that he had not segregated the fees because segregation was not necessary in this case. On redirect

examination, the Oystermen's attorney testified that he believed segregation was not necessary because the attorney's fees incurred for claims for which attorney's fees are not recoverable also "advanced the merits of the [Declaratory Judgments Act] claim" for which the Oystermen were entitled to recover attorney's fees.

STORM moved for directed verdict. Among its arguments, STORM objected that the Oystermen were required to segregate their attorney's fees and had failed to do so. The trial court overruled STORM's motion.

STORM presented the testimony of J. Studer, an attorney's fees expert. Studer testified that he had reviewed the billing records of the Oystermen's attorneys and had concluded that the attorney's fees requested by the Oystermen were not reasonable and necessary. Studer testified that the reasons for his opinion included that the Oystermen were requesting attorney's fees "not necessary and not related to the claim for which they're making claim on fees." He stated that it was his opinion that the Oystermen were "making [a] claim for fees for efforts that are related to issues or parties that [they] abandoned and that did not advance the claim for [which] they're seeking fees today."

The jury found that the Oystermen's reasonable and necessary attorney's fees for the trial court proceedings was $417,000. The jury also found that the Oystermen were entitled to conditional attorney's fees for different stages of appeal, totaling $75,000.

Two weeks after trial, Hillman filed a notice of nonsuit without prejudice. That same day, the Oystermen filed a motion for entry of judgment on the jury's verdict. The trial court granted the motion and signed the final judgment. The judgment recited that, before trial, the trial court had granted the Oystermen's motion for partial summary judgment for declaratory relief and had granted summary judgment against STORM on its counterclaims. The judgment also recited that STORM's countermotion for summary judgment had been denied.

The final judgment incorporated the jury's findings and awarded the Oystermen $417,000 in attorney's fees for proceedings through trial and a total of $75,000 in conditional appellate attorney's fees "pursuant to the Declaratory Judgments Act." The judgment stated that the Oystermen "shall take nothing by reason of their claim in the Tenth Amended Petition for Trespass to Try Title."

The same day that the trial court signed the final judgment, it also signed a separate order "granting" Hillman's nonsuit and ordering that "Stephen Hillman's claims be nonsuited without prejudice as to re-refiling of the same." In the final judgment, the trial court recognized that Hillman had "previously filed a Notice of Non-suit as to his claims in the Tenth Amended Petition." The judgment concluded by stating that it "dispose[d] of all claims and all parties."

**Declaratory Relief**

In its first issue, STORM challenges the declaratory relief granted in the trial court's September 28, 2016 partial summary judgment order. Declaratory judgments rendered by summary judgment are reviewed under the same standards that govern traditional summary judgments generally. *Hourani v. Katzen*, 305 S.W.3d 239, 248 (Tex. App.—Houston [1st Dist.] 2009, pet. denied). We review a traditional motion for summary judgment de novo to determine whether a party's right to prevail is established as a matter of law. *See Provident Life & Acc. Ins. Co. v. Knott*, 128 S.W.3d 211, 215 (Tex. 2003).

As discussed above, the trial court declared as follows in the partial summary judgment order:

> a. Texas Parks and Wildlife Department has the exclusive authority to control the planting and harvesting of oysters;
>
> b. Chambers-Liberty Counties Navigation District . . . has no legal authority to regulate oysters;
>
> c. [The Navigation District] did not have legal authority under the State Constitution or under State law to enter into the Coastal Surface Lease with Sustainable Texas Oyster Resource Management, L.L.C. ("STORM"), effective April 15, 2014; and
>
> d. The Coastal Surface Lease between [the Navigation District] and STORM, effective April 15, 2014, is null and void and is unenforceable against [the Oystermen's] rights and privileges granted by fishing and oystering licenses, leases, and permits issued by the State of Texas.

The Court further DECLARES that as to every counterclaim asserted by STORM in its live pleading, Plaintiffs [the Oystermen] are not trespassers as a matter of law, precluding relief to STORM by that counterclaim.

## A. Declaratory Relief Included in Final Judgment

STORM begins by pointing out that the declaratory relief was rendered in an interlocutory order granting partial summary judgment and contends that the declarations were not incorporated into the final judgment. However, contrary to this contention, the final judgment expressly references the interlocutory order, reciting that the trial court granted the Oystermen's motion for partial summary judgment for declaratory relief. The final judgment also recites, before awarding attorney's fees under the Declaratory Judgments Act, that the award was made "pursuant to the *prior declarations*, the jury verdict, and [the trial court's] determinations of law." (Emphasis added.) Moreover, even if the final judgment had not referenced and relied on the interlocutory order, the partial summary judgment granting the declaratory relief merged into the final judgment. *See Bonsmara Nat. Beef Co., LLC v. Hart of Tex. Cattle Feeders, LLC*, 603 S.W.3d 385, 390 (Tex. 2020) ("When a trial court renders a final judgment, the court's interlocutory orders merge into the judgment . . . ."); *City of Beaumont v. Guillory*, 751 S.W.2d 491, 492 (Tex. 1988) (per curiam) (holding partial summary judgment becomes appealable when it merges into final judgment).

## B.     Declaratory-Judgments-Act Claim is a Standalone Claim

STORM also points out that, prior to trial, the Oystermen had abandoned their claims for tortious interference and conspiracy. And, when trial began, the Oystermen stated on the record that they were also abandoning their claims to quiet title and for trespass to try title. At that point, the Oystermen's claim for declaratory relief remained in the Tenth Amended Petition, the live pleading. In its order for partial summary judgment, the trial court had earlier granted the Oystermen's requested declaratory relief and ordered that the Oystermen were entitled to their reasonable and necessary attorney fees under the Declaratory Judgments Act, but the amount of the Oystermen's reasonable and necessary attorney's fees remained to be tried. *See* TEX. CIV. PRAC. & REM. CODE § 37.009.

STORM asserts that the declaratory relief rendered by the trial court cannot stand because, when the final judgment was signed, the Oystermen had no live causes of action aside from their claim under Declaratory Judgments Act. STORM incorrectly suggests that a claim under the Declaratory Judgments Act must be asserted in combination with another cause of action. This and other courts have long recognized that a suit under the Declaratory Judgments Act is not confined to cases in which the parties have a cause of action apart from a claim under the Act itself. *Garwood Irr. Co. v. Lundquist*, 252 S.W.2d 759, 760 (Tex. App.—Galveston 1952, writ ref'd); *see Tex. Dep't of Pub. Safety v. Moore*, 985 S.W.2d 149, 153 (Tex.

23

App.—Austin 1998, no pet.); *Transp. Ins. Co. v. Franco*, 821 S.W.2d 751, 754 (Tex. App.—Amarillo 1992, writ denied). "To hold that there must be a cause of action as that term is ordinarily used [in addition to a Declaratory-Judgments-Act claim] would defeat the fundamental purpose and destroy the real value of the remedy" provided by the Act. *Garwood Irr. Co.*, 252 S.W.2d at 760. In short, a suit may be pursued on a claim under the Declaratory Judgments Act alone, without asserting an additional cause of action, and we reject STORM's assertion to the contrary.[1] *See Moore*, 985 S.W.2d at 153; *Franco*, 821 S.W.2d at 754; *Garwood Irr. Co.*, 252 S.W.2d at 760.

## C. Coastal Surface Lease's Validity Properly Determined under the Declaratory Judgments Act

STORM argues that the trial court erred by granting partial summary judgment on the Oystermen's claim for declaratory relief because the Declaratory Judgments Act "cannot be used to determine questions of title to real property."

---

[1] The critical requirements to obtain a declaratory judgment are (1) the existence of a justiciable controversy as to the rights and status of the parties, and (2) the declaration will resolve the controversy. *See Brooks v. Northglen Ass'n*, 141 S.W.3d 158, 163–64 (Tex. 2004). A justiciable controversy is one in which a real and substantial controversy exists involving a genuine conflict of tangible interest and not merely a theoretical dispute. *Unocal Pipeline Co. v. BP Pipelines (Alaska) Inc.*, 512 S.W.3d 492, 505 (Tex. App.—Houston [1st Dist.] 2016, pet. denied). Here, the dispute over the validity of the Coastal Surface Lease, which STORM relied on to treat the Oystermen as trespassers and prevent their access to areas within the lease, including the public fishing grounds, was a justiciable controversy. The trial court's declarations, including its declaration that the Coastal Surface Lease was void and unenforceable, resolved the controversy.

STORM points out that the Oystermen pleaded and then abandoned their claim for trespass to try title. STORM asserts that, by allowing the Oystermen to obtain a declaration regarding the validity of the Coastal Surface Lease, the Oystermen were permitted to recover the same relief that they sought in their trespass-to-try-title claim—i.e., "that their [oyster] leases are valid and STORM's [lease] is not"—without requiring the Oystermen to prove trespass-to-try title.

A declaratory-judgment action "provides an efficient vehicle for parties to seek a declaration of rights under certain instruments." *Martin v. Amerman*, 133 S.W.3d 262, 265 (Tex. 2004). The Supreme Court of Texas has recognized that "[t]he issue of whether a claimant must seek relief related to property interests through a trespass-to-try-title action, as opposed to a suit under the Declaratory Judgments Act, has been the source of some confusion in [that] Court and others." *Lance v. Robinson*, 543 S.W.3d 723, 735 (Tex. 2018).

The Declaratory Judgments Act provides,

> A person interested under a deed, will, written contract, or other writings constituting a contract or whose rights, status, or other legal relations are affected by a statute, municipal ordinance, contract, or franchise may have determined any question of construction or validity arising under the instrument, statute, ordinance, contract, or franchise and obtain a declaration of rights, status, or other legal relations thereunder.

25

TEX. CIV. PRAC. & REM. CODE § 37.004(a). The purpose of the Act is to settle and to afford relief from uncertainty and insecurity with respect to rights, status, and other legal relations. *Id.* § 37.002(b).

In contrast, the Texas Property Code provides that "[a] trespass to try title action is the method of determining title to lands, tenements, or other real property." TEX. PROP. CODE § 22.001(a). A trespass-to-try-title action "is typically used to clear problems in chains of title or to recover possession of land unlawfully withheld from a rightful owner." *Martin*, 133 S.W.3d at 265. The Supreme Court of Texas has determined that a trespass-to-try-title action is the proper procedural vehicle "when the claimant is seeking to establish or obtain *the claimant's* ownership or possessory right in the land at issue." *Lance*, 543 S.W.3d at 736 (emphasis in original). However, if the claimant seeks a declaration regarding a defendant's authority to obstruct the claimant's access to the disputed area, then the claimant may receive declaratory relief under the Declaratory Judgments Act. *See id.* at 734–35. For example, the supreme court has determined "that the trespass-to-try-title statute does not apply to a claimant who seeks to establish an easement, because such a claimant does not have such a possessory right. An easement is a nonpossessory interest that authorizes its holder to use the property for only particular purposes." *Id.* at 736 (internal citation and quotation marks omitted).

26

Similarly, here, among their claims, the Oystermen asserted a nonpossessory interest to harvest oysters in the public fishing grounds within the boundaries of the Coastal Surface Lease pursuant to the permits and licenses they received from the TPWD. In their pleadings and in the motion for summary judgment proceeding, the Oystermen sought declarations relating to the Coastal Surface Lease's validity to enforce their right to access the public fishing grounds. *See id.* at 737. By asserting their rights to harvest oysters in the public fishing grounds, the Oystermen did not claim any ownership or possessory interest in the disputed area. Instead, they sought to void STORM's lease to defend their nonpossessory interests from exclusion and obstruction by STORM. *See id.* Thus, it was proper for the trial court to render declarations invalidating STORM's lease. *See id.* (holding relief under Declaratory Judgments Act proper when plaintiff sought declaration that defendant had no ownership interest in property, not to assert superior title or possessory rights, but to defend nonpossessory easement). The overall effect of declaring the lease void and "unenforceable against [the Oystermen's] rights and privileges granted by fishing and oystering licenses, leases, and permits" was only to deprive STORM of the ability to exclude the Oystermen from the disputed areas within its lease and prevent STORM from treating the Oystermen as trespassers. *See id.* While the declarations implicated the validity of the Oystermen's certificates of location and oyster leases, the declarations did not determine the Oystermen's ownership or possessory rights

27

in any disputed areas within the Coastal Surface Lease. We hold that the Declaratory Judgments Act was the correct mechanism to invalidate the Coastal Surface Lease, and the Oystermen were not required to prove a trespass-to-try-title claim.

## D.     Declarations Correct as Matter of Law

STORM further asserts that the trial court's declarations—that the Navigation District "did not have legal authority under the State Constitution or under State law to enter into the Coastal Surface Lease with [STORM]" and that the lease is void and unenforceable—are incorrect as a matter of law. After STORM's opening brief was filed in this case, the Supreme Court of Texas held in *Chambers-Liberty Counties Navigation District v. State*—a case involving the validity of the same Coastal Surface Lease at issue here—that the TPWD, not the Navigation District, has the "exclusive regulatory authority" to grant the right "to cultivate and harvest oysters on submerged land beneath state waters." 575 S.W.3d at 353.

In that case, the State of Texas filed suit in Travis County against the Navigation District, its Commissioners in their official capacities, and STORM, seeking to invalidate the Coastal Surface Lease "under the theory that Texas law affords the [TPWD], not the District, the sole power to decide who may and may not cultivate oysters" in and around Galveston Bay. *Id.* at 341. The State sought a declaratory judgment that the Coastal Surface Lease was void because it exceeds the lawful authority of the Navigation District and its Commissioners, who acted ultra

28

vires by entering into the lease. *Id.* at 343. The State also requested monetary damages, which it described as "restitution," from the Navigation District and STORM under sections 12.301 and 12.303 of the Parks and Wildlife Code. *Id.*

The Navigation District and its Commissioners filed a plea to the jurisdiction and a motion to dismiss under Texas Rule of Civil Procedure 91a, asserting that the Navigations District's immunity from suit barred the State's claims. *Id.* The trial court denied the plea and the motion. *Id.*

The Navigation District and the Commissioners (but not STORM) filed an interlocutory appeal in the Third Court of Appeals, challenging the denial of the plea to the jurisdiction and motion to dismiss. *Id.* at 343–44. The court of appeals reversed the portion of the trial court's order permitting the State to pursue an ultra vires claim against the Navigation District itself but otherwise affirmed the denial of the plea to the jurisdiction. *Id.* at 344. The court of appeals held that the State could pursue a claim against the Navigation District for money damages under the Parks and Wildlife Code. *Id.* It also held that the State could not pursue ultra vires claims against the Navigation District, but it could pursue ultra vires claims against the Commissioners in their official capacities. *Id.* The court determined that issuing the Coastal Surface Lease exceeded the Commissioners' lawful authority and that the State had therefore pleaded a viable ultra vires claim against the Commissioners. *Id.*

The Supreme Court of Texas granted the Commissioners' petition for review. The court held that the court of appeals erred by permitting the State to pursue monetary relief against the Navigation District under the Parks and Wildlife Code because the State's claims against the Navigation District were barred by immunity. *Id.* at 348. The court held that the court of appeals had correctly determined that the State's ultra vires claim could not proceed against the Navigation District itself. *Id.*

The court also affirmed the court of appeals' conclusion that the State had properly asserted an ultra vires claim against the Commissioners in their official capacities by asserting that the Commissioners had acted beyond their statutory authority when they entered into the Coastal Surface Lease with STORM. *Id.* at 349. In its analysis of this issue, the supreme court stated that, "[t]o determine whether the District, through its Commissioners, acted beyond its legal authority, we first examine the sources of that authority." *Id.* at 350. The court recognized that the Navigation District's authority derives from Article XVI, Section 59 of the Texas Constitution. *Id.* The court explained that Article XVI, Section 59(b) provides that the "rights, privileges and functions" of the Navigation District are limited to those "conferred by law." *Id.* The source of such law is enactments of the Legislature. *Id.* The court stated that the Navigation District "was originally created under TEX. REV. CIV. STATS. ANN. art. 8225 (1925)" and noted that article 8225 confirmed that the Navigation District's purposes are only those which are "authorized by law." *Id.*

30

"Navigation districts created by Article XVI, Section 59 are governed by Chapter 62 of the Water Code." *Id.* 350–51 (citing TEX. WATER CODE § 62.021 ("A navigation district may be created in the manner prescribed by this subchapter under Article XVI, Section 59, of the Texas Constitution.")).

The supreme court recognized that "[a] district created under Chapter 62 may acquire land." *Id.* at 351 (citing TEX. WATER CODE § 62.107(a)). And a district may "lease and grant easements on any part of the acquired land to any person and may charge for the lease or easement reasonable tolls, rents, fees, or other charges." *Id.* (citing TEX. WATER CODE §§ 62.107(b), 60.038(a)). However, the supreme court clarified "that general authority to lease land is not a license to enter into any lease imaginable. As with any other activity it undertakes, the District may exercise its authority to lease land only when doing so is consistent with its limited statutory purposes conferred by law." *Id.* (citing TEX. CONST. art XVI, § 59(b)).

The court stated that the Navigation District's leasing authority needed to be considered in conjunction with the statutory provisions of the Water Code, which established the Navigation District's limited purpose: navigation. *Id.* (citing TEX. WATER CODE. §§ 61.116(b), 63.152, 63.153). The court noted that "[t]he sources of legislative authority on which the Commissioners rel[ied] [did] not expressly mention oyster cultivation and harvesting." *Id.* And "[t]he closest the Commissioners [came] to a specific statutory source of such authority is section

31

61.116(b) of the Water Code, which defines 'navigation' as referring 'to marine commerce and immediately related activities, including . . . commercial and sport fishing.'" *Id.* But, section 61.116(b) did "not expressly refer to oysters, and it is not directly applicable to the District, because Chapter 61 governs districts created under Article III, Section 52 of the Texas Constitution," while the Navigation District "was created under Article XVI, Section 59." *Id.*

The court observed: "Whether, standing alone, the District's generic statutory authority to lease land and regulate commerce and wildlife for navigation purposes is sufficient to authorize it to go into business as an oyster landlord is perhaps a close question." *Id.* However, "[t]he District's enabling statutes do not exist in a vacuum" and must be considered along with "other sources of state law that limit or enlarge the District's legal authority," such as "the Parks and Wildlife Code, which contains an extensive and exclusive grant of authority to the [TPWD] to regulate the harvesting and cultivation of oysters." *Id.*

The court was mindful that it had "previously held that if the Legislature has enacted two statutory regimes that arguably govern the conduct of the parties, the regime that more narrowly and with more specificity covers the conduct at issue is presumed to govern." *Id.* Specific provisions of the Parks and Wildlife Code give the TPWD, not the Navigation District, "the authority under Texas law to regulate the conservation and harvesting of oysters." *Id.* at 352; *see* TEX. PARKS & WILD.

32

CODE § 1.011(c) ("All the beds and bottoms and the products of the beds and bottoms of the public rivers, bayous . . . bays . . . and of that part of the Gulf of Mexico within the jurisdiction of this state are the property of this state. The state may permit the use of the waters and bottoms and the taking of the products of the bottoms and waters."); *id.* § 1.011(d) ("The Parks and Wildlife Department shall regulate the taking and conservation of fish, oysters . . . and all other kinds and forms of marine life . . . in accordance with the authority vested in it by this code."); *id.* § 12.001(a) (stating, without reservation, that TPWD "shall administer the laws relating to game, fish, oysters, and marine life"); *id.* § 12.0011(a) (TPWD "is the state agency with primary responsibility for protecting the state's fish and wildlife resources").

The supreme court found to be significant that "the Parks and Wildlife Code has an entire chapter—Chapter 76—vesting the Department with detailed authority over the regulation of oysters." *Chambers-Liberty Ctys. Navigation Dist.*, 575 S.W.3d at 352. Chapter 76 contains over forty provisions, including section 76.003, which provides that oyster beds and reefs, other than natural oyster beds, are "subject to location by the [TPWD]." *Id.* (citing TEX. PARKS & WILD. CODE § 76.003). The court discussed numerous provisions in Chapter 76 governing various aspects of oyster production. *Id.* at 352–53. The supreme court then concluded:

> The detailed, specific regulatory authority described above does not give way when it comes into conflict with general provisions regarding the authority of navigation districts, none of which relate specifically to oysters. The conflict is more than theoretical. In this case, STORM has

33

attempted to stop oyster cultivation by third parties to whom the Department has granted certificates of location. And the rights granted to STORM under the Lease purport to give it the right to cultivate and harvest oysters over an area vastly exceeding the area permitted under Chapter 76 of the Parks and Wildlife Code.

*Id.* at 353.

The court also addressed an argument raised by the Commissioners and by STORM, which sought to participate in the supreme court proceedings.[2] STORM and the Commissioners claimed that the Navigation District's "ownership of the submerged lands in fee simple [gave] it a property right to lease its land free from the [TPWD's] interference." *Id.* They asserted that the Navigation District's "alleged right to lease its submerged land for oyster cultivation, even though the State regulates the oysters, is like the right of a rancher to lease his land for deer hunting even though the State regulates the wild deer." *Id.* STORM contended that, if the Navigation District cannot lease its submerged land to whom it chooses, "then no landowner is safe from the Parks and Wildlife Department's interference with property rights." *Id.*

The supreme court found "[that] line of argument [to be] specious," explaining as follows:

---

[2]     At the end of its opinion, the supreme court held that STORM could not participate in the supreme court proceedings because it had not been involved in the Navigation District's plea to the jurisdiction and was not a party in the court of appeals. *Chambers-Liberty Ctys. Navigation Dist. v. State*, 575 S.W.3d 339, 355–56 (Tex. 2019).

The District is not a private property owner. It is the government. This case has nothing to do with private property rights. The only real estate at issue is public. Unlike private landowners, whose fundamental private property rights pre-date the constitution and are protected by several provisions of it, navigation districts have no private property rights. Any "rights" a navigation district can be said to have come directly from the Legislature, and the Legislature may cabin or limit those "rights" as it sees fit. To the extent the Legislature may have given the District some oblique grant of power to execute oyster-cultivation leases under the Water Code, it took that power away in the Parks and Wildlife Code by vesting specific and exclusive regulatory authority over oyster cultivation in the Department. The statutory-interpretation question before the Court has nothing to do with property rights and everything to do with the scope of authority granted by the Legislature to various components of government. By contrast, a private landowner objecting to state interference with his right to lease his land would have all manner of constitutional, statutory, and common-law arguments that the District does not, and cannot, make. Such a case would look nothing like this one.

*Id.*

Ultimately, after considering "the extensive and exclusive regulatory authority vested in the Parks and Wildlife Department by the Legislature to decide who may cultivate and harvest oysters in state waters," the court held, albeit on a "limited record," that "the Commissioners exceeded their authority by entering into a Lease that purported to grant to STORM the exclusive right to cultivate and harvest oysters on submerged land beneath state waters." *Id.* The court further held that the authority to grant the right to cultivate and harvest oysters "rests exclusively with the [TPWD]." *Id.* The court explained, "If it were shared with the District and other

35

similarly situated local governments, the [TPWD] could not carry out its statutory obligations unfettered by local interference." *Id.*

The arguments raised by the Commissioners and rejected by the supreme court in *Chambers-Liberty Counties Navigation District* are essentially the same as those raised by STORM here to support its contention that the Navigation District had the legal authority to issue the Coastal Surface Lease. Even though the supreme court's decision was in the context of an interlocutory appeal involving a plea to the jurisdiction on a "limited record," we are bound by the supreme court's determination of law that the authority to grant parties the right to cultivate and harvest oysters on the submerged land beneath state waters rests exclusively with the TPWD. *See id.*; *see also Swilley v. McCain*, 374 S.W.2d 871, 875 (Tex. 1964) ("After a principle, rule or proposition of law has been squarely decided by the Supreme Court, or the highest court of the State having jurisdiction of the particular case, the decision is accepted as a binding precedent by the same court or other courts of lower rank when the very point is again presented in a subsequent suit between different parties."). Thus, the Navigation District had no legal authority to issue the Coastal Surface Lease to STORM. *See Chambers-Liberty Ctys. Navigation Dist.*, 575 S.W.3d at 353. We hold that the trial court's declarations—that the Navigation District "did not have legal authority under the State Constitution or under State law

36

to enter into the Coastal Surface Lease with [STORM]" and that the lease is void and unenforceable—are correct as a matter of law. *See id.*

## E.    No Conflict Between Declarations and Final Judgment

Finally, we address STORM's assertion that the provision in the final judgment, ordering that the Oystermen take nothing by their abandoned trespass-to-try-title claim, conflicts with declarations in the order granting partial summary judgment. STORM asserts that, "because the final judgment renders judgment against the [Oystermen] on their trespass to try title claim, it necessarily vests title and the right of possession to the land in STORM." In support of its position, STORM relies on the following language from *Hejl v. Wirth*:

> It has long been the rule in this State that in a trespass to try title suit, the plaintiff must recover upon the strength of his own title. If the plaintiff under the circumstances fails to establish his title, the effect of a judgment of take nothing against him is to vest title in the defendant. The rule is a harsh one, but it also has been well established as a rule of land law in this State.

343 S.W.2d 226, 226 (Tex. 1961).

STORM asserts that "[t]he final judgment, which renders judgment against the [Oystermen] on their trespass to try title claim," conflicts with the declarations in the partial summary judgment order, which STORM contends gave the Oystermen "a superior right of possession to the leased land." STORM claims that, under the rule in *Hejl*, the take nothing order in the final judgment operates to nullify the

declarations in the partial summary judgment order and to vest title in disputed land in STORM. We disagree for two reasons.

First, no conflict exists between the final judgment and the partial summary judgment order because, as discussed, the declarations do not give the Oystermen ownership or possession of the disputed areas. Second, we do not agree that the rule stated in *Hejl* applies here. The supreme court made clear in *Chambers-Liberty Counties Navigation District* that the TPWD has the exclusive authority to grant parties the right to cultivate and harvest oysters on the submerged public land beneath the state waters of Galveston Bay. *See* 575 S.W.3d at 353. In the extensive and detailed statutory scheme governing oyster conservation and cultivation in Texas, the Legislature has decided that only the TPWD may determine who will receive a certificate of location, lease, permit, or license to cultivate and harvest oysters in Texas. *See id.* Thus, the action or inaction of a private party in prosecuting its trespass-to-try title claim cannot operate to override that Legislative mandate and permit a party not approved by the TPWD to engage in oyster-production activities.

For all the above-stated reasons in this and the proceeding subsections, we hold that the trial court did not err when it granted the Oystermen's partial summary judgment on their requested declaratory relief. Accordingly, we overrule STORM's first issue.

**STORM's Counterclaims**

In its second issue, STORM contends that the trial court erred when it granted summary judgment in favor of the Oystermen on STORM's trespass and related counterclaims. The trial court's order granting partial summary judgment stated:

> The Court further DECLARES that as to every counterclaim asserted by STORM in its live pleading, [the Oystermen] are not trespassers as a matter of law, precluding relief to STORM by that counterclaim. It is therefore ORDERED that Defendant STORM's claims of trespass, conversion, money had and received, accounting, and request for injunctive relief are DISMISSED WITH PREJUDICE and that STORM shall take nothing by its counterclaims against [the Oystermen].

STORM asserts, "The trial court's dismissal of STORM's counterclaims was premised on its conclusion that the [Oystermen] are not trespassers as a matter of law. Because the [Oystermen] are in fact trespassers as a matter of law, this Court should reverse the dismissal of STORM's counterclaims." STORM further asserts that its "primary cause of action is for trespass" and that each of its additional counterclaims is "directly related to the trespass claim." STORM contends that, if the trial incorrectly determined that the Oystermen were not trespassers, then summary judgment on all its counterclaims must be reversed.

"Trespass" is defined as "an unauthorized entry upon the land of another." *Envtl. Processing Sys., L.C. v. FPL Farming Ltd.*, 457 S.W.3d 414, 424 (Tex. 2015) (quoting *Barnes v. Mathis*, 353 S.W.3d 760, 764 (Tex. 2011)). The gist of a claim for trespass to real property is the injury to the right of possession. *Coastal Oil &*

*Gas Corp. v. Garza Energy Trust*, 268 S.W.3d 1, 9 (Tex. 2008). The supreme court has defined "trespasser" to mean "someone who 'enters upon the property of another without any right, lawful authority, or express or implied invitation, permission, or license.'" *Envtl. Processing Sys., L.C.*, 457 S.W.3d at 424 (quoting *Tex.-La. Power Co. v. Webster*, 91 S.W.2d 302, 306 (Tex. 1936)).

STORM re-asserts its contention that "the final judgment vests title and the right of possession [of the submerged land] in STORM." It also asserts that the Navigation District "is the owner of the submerged land and has the exclusive right to possess and lease that land to others." STORM contends that "for both of these reasons STORM—and not the [Oystermen]—is entitled to possession of the land and has the exclusive right to use the land for cultivating and harvesting oysters." However, we have already determined that the final judgment did not vest title or right of possession in STORM. And we have determined that the Navigation District did not have legal authority to issue the Coastal Surface Lease. *See Chambers-Liberty Ctys. Navigation Dist.*, 575 S.W.3d at 353. Moreover, the summary-judgment evidence included the Oystermen's certificates of location issued by TPWD, permitting the Oystermen to enter the disputed area to cultivate and harvest oysters. Thus, the trial court properly concluded that the Oystermen were not trespassers in the context of STORM's claims against them, which were based on

40

the Oystermen's oyster-harvesting activities in the disputed area. We hold that the trial court did not err in granting summary judgment on STORM's counterclaims.

We overrule STORM's second issue.

## Attorney's Fees

In its third issue, STORM contends that the trial court erred by awarding attorney's fees to the Oystermen under the Declaratory Judgments Act. Under the Act, a court "may award . . . reasonable and necessary attorney's fees as are equitable and just." TEX. CIV. PRAC. & REM. CODE § 37.009. Based on the jury's findings, the trial court awarded the Oystermen $417,000 in attorney's fees for the trial-court proceedings and a total of $75,000 in conditional appellate attorney's fees.

In challenging the attorney's fees award, STORM again asserts that the Oystermen's request to invalidate the Coastal Surface Lease was in effect a claim for trespass to try title, a claim that does not permit the recovery of attorney's fees. *See Martin*, 133 S.W.3d at 267 (holding that when "the trespass-to-try-title statute governs the parties' substantive claims . . ., [the plaintiff] may not proceed alternatively under the Declaratory Judgments Act to recover their attorney's fees"). Because we have held that they were entitled to declaratory relief, the Oystermen were entitled to obtain attorney's fees under the Declaratory Judgments Act. *See* TEX. CIV. PRAC. & REM. CODE § 37.009.

41

STORM also challenges the attorney's fees award on the ground that the Oystermen failed to segregate the fees between recoverable and unrecoverable fees. Texas law does not allow for recovery of attorney's fees unless authorized by statute or contract. *Tony Gullo Motors I, L.P. v. Chapa*, 212 S.W.3d 299, 310 (Tex. 2006). As a result, attorney's-fee claimants have always been required to segregate fees between claims for which they are recoverable and claims for which they are not. *Id.* at 311. The need to segregate attorney's fees is a question of law, and the extent to which certain claims can or cannot be segregated is a mixed question of law and fact. *Id.* at 312–13; *CA Partners v. Spears*, 274 S.W.3d 51, 81 (Tex. App.—Houston [14th Dist.] 2008, pet. denied). The party seeking to recover attorney's fees has the burden of demonstrating that fee segregation is not required. *Lion Co-Polymers Holdings, LLC v. Lion Polymers, LLC*, No. 01-16-00848-CV, 2018 WL 3150863, at *17 (Tex. App.—Houston [1st Dist.] June 28, 2018, pet. denied) (mem. op.) (citing *Hong Kong Dev., Inc. v. Nguyen*, 229 S.W.3d 415, 455 (Tex. App.—Houston [1st Dist.] 2007, no pet.)).

If any attorney's fees relate solely to a claim for which such fees are unrecoverable, a claimant must segregate recoverable from unrecoverable fees. *Chapa*, 212 S.W.3d at 313. "Intertwined facts do not make tort fees recoverable; it is only when discrete legal services advance both a recoverable and unrecoverable claim that they are so intertwined that they need not be segregated." *Id.* at 313–14.

42

"[T]o meet a party's burden to segregate its attorney['s] fees, it is sufficient to submit to the fact-finder testimony from a party's attorney concerning the percentage of hours related to claims for which fees are not recoverable." *RM Crowe Prop. Servs. Co., L.P. v. Strategic Energy, L.L.C.*, 348 S.W.3d 444, 453 (Tex. App.—Dallas 2011, no pet.); *see Chapa*, 212 S.W.3d at 314 & n.83; *Young v. Dimension Homes, Inc.*, No. 01-14-00331-CV, 2016 WL 4536407, at *10 (Tex. App.—Houston [1st Dist.] Aug. 30, 2016, no pet.) (mem. op.) ("[A]n attorney can satisfy his evidentiary burden by presenting evidence of unsegregated attorney's fees and a rough percentage of the amount attributable to the claims for which fees are not recoverable.").

In addition to their claim for declaratory relief, for which attorney's fees were recoverable, the Oystermen also asserted claims for trespass to try title, tortious interference with prospective business relations, and conspiracy in the restraint of trade, claims for which attorney's fees were not recoverable. *See Palacios v. Patel*, No. 02-18-00119-CV, 2018 WL 2728441, at *4 (Tex. App.—Fort Worth June 7, 2018, no pet.) (mem. op.) (attorney's fees not recoverable for civil conspiracy); *Friend v. Friend*, No. 02-15-00166-CV, 2016 WL 7240596, at *2 (Tex. App.—Fort Worth Dec. 15, 2016, no pet.) (mem. op.) (attorney's fees not recoverable for tortious interference); *I-10 Colony, Inc. v. Lee*, 393 S.W.3d 467, 477 (Tex. App.—Houston

43

[14th Dist.] 2012, pet. denied) (attorney's fees not recoverable in trespass-to-try-title action).

As evidence of their attorney's fees, the Oystermen offered the testimony of one of their attorneys and redacted billing records. The Oystermen's attorney testified that the reasonable and necessary amount of attorney's fees incurred by the Oystermen in the trial-court proceedings was $417,000. On cross-examination, STORM asked the Oystermen's attorney whether he had segregated the attorney's fees between claims on which attorney's fees may be recovered and those for which they may not. The attorney responded that he had not segregated the fees because segregation was not necessary in this case. On redirect examination, the Oystermen's attorney testified, without elaboration, that he believed segregation was not necessary because the attorney's fees incurred for claims for which attorney's fees are not recoverable also "advanced the merits of the [Declaratory Judgments Act] claim" for which the Oystermen were entitled to recover attorney's fees. On further cross-examination, the attorney testified that the "legal services that had been performed in connection with claims for which attorney's fees would not be recoverable like a tort claim, in my opinion advanced the prosecution of the claims for which we could recover attorney's fees and so I had not segregated."

An examination of the record, however, shows that evidence of fee segregation was required. Discrete legal services were expended to advance claims

for which fees were not recoverable. As an example, we observe that the Oystermen filed ten versions of their petition, pleading separate claims for which attorney's fees are not recoverable. In each of their ten petitions, the Oystermen pleaded trespass to try title, set out in several paragraphs in each petition. The Oystermen also pleaded tortious interference with prospective business relations in their first seven petitions along with a request for actual and exemplary damages. And, the Oystermen added conspiracy in the restraint of trade in their Sixth Amended Petition, omitting it after their Seventh Amended Petition. Where asserted, the claims for tortious interference and for conspiracy, along with the request for associated damages, comprised multiple paragraphs.

We are mindful that unrecoverable fees are not rendered recoverable "merely because they are nominal." *Chapa*, 212 S.W.3d at 313. If any of the component tasks relate solely to a cause of action for which legal fees are not recoverable, the claimant must segregate the fees. *7979 Airport Garage, L.L.C. v. Dollar Rent A Car Sys., Inc.*, 245 S.W.3d 488, 509 (Tex. App.—Houston [14th Dist.] 2007, pet. denied) (op. on reh'g). Courts have determined that evidence of fee segregation is required concerning the drafting of a petition when the petition pleads causes of action for which attorney's fees are both recoverable and unrecoverable, and portions of the petition relate solely to the causes of action for which fees are unrecoverable. *See Chapa*, 212 S.W.3d at 313. ("But when Chapa's attorneys were drafting her

pleadings or the jury charge relating to fraud, there is no question [that] those fees were not recoverable."); *Chevron Phillips Chem. Co. LP v. Kingwood Crossroads, L.P.*, No. 09-14-00316-CV, 2017 WL 4182292, at *8 (Tex. App.—Beaumont Sept. 21, 2017, no pet.) (mem. op.) (reversing attorney's fees award when unrecoverable fees for drafting paragraphs in petitions not segregated); *CA Partners*, 274 S.W.3d at 84 (holding fee segregation required when claims for which fees were not recoverable required "drafting separate portions of [the appellee's] pleading," "separate legal research," and "possibly separate discovery requests"); *7979 Airport Garage, L.L.C.*, 245 S.W.3d at 509–10 (determining that fees were unrecoverable for neither drafting paragraph of petition asserting claim for which fees were not recoverable nor for drafting two jury-charge questions related to that claim and reversing attorney's fees award for failure to segregate those fees).

Here, the attorney's fees incurred to prepare the portions of the Oystermen's petitions relating solely to the causes of action for trespass to try title, tortious interference with prospective business relations, and conspiracy were not recoverable, and the attorney's fees for drafting those portions of the petitions should have been segregated. Even if these fees are nominal, they must nonetheless be segregated from the recoverable fees.[3] *See Chapa*, 212 S.W.3d at 313; *Corey v.*

---

[3] We are not suggesting that there are no additional attorney's fees that may need to be segregated. We are using the unrecoverable fees incurred in preparing the petitions only as an example.

46

*Rankin*, No. 14–17–00752–CV, 2018 WL 5914531, at *11 (Tex. App.—Houston [14th Dist.] Nov. 13, 2018) (mem. op.).

We conclude that the Oystermen were required to present evidence of the segregation of their attorney's fees. *See Chapa*, 212 S.W.3d at 313–14. Because they did not do so, we must reverse the attorney's fees award and remand the issue to the trial court for a new trial on that limited issue. *See id.* at 314; *see also McMahon v. Zimmerman*, 433 S.W.3d 680, 691 (Tex. App.—Houston [1st Dist.] 2014, no pet.) ("Typically, if segregation is required and the claimant does not provide testimony from counsel on the proper segregation of the fee, the cause is remanded for a factual determination of the portion of the attorneys' work that is attributable to the recoverable claim."). This includes a reversal and remand of the attorney's fees incurred during the trial-court proceedings and the conditional appellate attorney's fees. *See Prudential Ins. Co. v. Durante*, 443 S.W.3d 499, 515 (Tex. App.—El Paso 2014, pet. denied) (reversing and remanding appellate attorney's fees when appeal was partially successful based on segregation-of-fees issue).

We sustain STORM's third issue for the reasons discussed above.

### Hillman's Nonsuit

In its fifth issue, STORM contends that the trial court erred by permitting Hillman to nonsuit his claims without prejudice after trial on the Oystermen's

attorney's fees.[4] STORM asserts that "[t]he nonsuit of Plaintiff Hillman's claims against STORM without prejudice after the close of evidence and trial was an improper attempt to avoid a final judgment that he take nothing because he proved nothing."

The record reflects that after trial on the Oystermen's attorney's fees, but before the trial court signed the final judgment, Hillman filed a notice that he was nonsuiting his claims without prejudice. The same day that the trial court signed the final judgment, it also signed a separate order "granting" Hillman's nonsuit and ordering that "Stephen Hillman's claims be nonsuited without prejudice as to re-refiling of the same." The final judgment noted that "Plaintiff Stephen Hillman has previously filed Notice of Nonsuit as to his claims in the Tenth Amended Petition." STORM objected to the nonsuit in its motion for new trial, which was denied.

STORM complains that the Rules of Civil Procedure prohibit a party from nonsuiting its claims after it has finished presenting its evidence at trial. *See* TEX. R. CIV. P. 162; *Epps v. Fowler*, 351 S.W.3d 862, 868 (Tex. 2011). "The trial court may, however, grant a plaintiff's nonsuit after the close of evidence in its sound discretion." *M & E Endeavours LLC v. Cintex Wireless LLC*, No. 01-15-00234-CV, 2016 WL 1590642, at *5 (Tex. App.—Houston [1st Dist.] Apr. 19, 2016, no pet.)

---

[4]  We consider STORM's fifth issue before its fourth issue for purposes of organization and efficiency.

(mem. op.) (citing *Miller v. Sam Montgomery Oldsmobile Co.*, 656 S.W.2d 917, 918–19 (Tex. App.—Houston [1st Dist.] 1983, writ dism'd)); *see also O'Brien v. Stanzel*, 603 S.W.2d 826, 828 (Tex. 1980) ("We do not hold that there are no situations in which a trial court may exercise discretion even though the trial has progressed beyond the rule's point of no return.").

Although Hillman filed his notice of nonsuit after trial on the Oystermen's attorney's fees, the record reflects that Hillman did not participate in trial. The order for partial summary judgment provided that the Oystermen "shall recover from Defendant STORM their reasonable and necessary attorney fees and costs under TEX. CIV. PRAC. & REM. CODE § 37.009." The order did not state that Hillman could recover attorney's fees.

The final judgment stated that "[a]fter announcements of ready for trial, the Court and jury heard the evidence submitted by Plaintiffs Hannah Reef, Inc., Shrimps R Us, Inc., Ivo Slabic, and Michael Ivic, Plaintiffs [sic], and Defendant Sustainable Texas Oyster Resource Management, L.L.C. (STORM)." Nothing in the record indicates that Hillman participated in trial. The final judgment reflects that only the Oystermen were awarded attorney's fees, not Hillman. Considering these circumstances, the trial court did not abuse its discretion in allowing Hillman to nonsuit his claims without prejudice. *See O'Brien*, 603 S.W.2d at 828; *M & E Endeavours LLC*, 2016 WL 1590642, at *5; *Miller*, 656 S.W.2d at 919.

49

We overrule STORM's fifth issue.[5]

## Venue

In its fourth issue, STORM requests that we reconsider our affirmance in the interlocutory appeal of the trial court's order denying STORM's motion to transfer venue from Galveston County to Chambers County. *See Sustainable Tex. Oyster Res. Mgmt. L.L.C.*, 491 SW.3d at 112. STORM qualifies its request by stating that it seeks reconsideration of the venue issue if "any part of the Chambers County claims is retried." Because the only issue being remanded to the trial court is the issue of attorney's fees, we do not read STORM's request to encompass that issue. But even if it does, the law-of-the case doctrine applies to our earlier holding regarding venue. *See Nw. Indep. Sch. Dist. v. Carroll Indep. Sch. Dist.*, 414 S.W.3d 684, 688 (Tex. App.—Fort Worth 2014, pet. denied) (en banc) (holding that decision on question of law in earlier, interlocutory appeal was "law of the case" in subsequent appeal from final judgment).

The law-of-the case doctrine is defined as "that principle under which questions of law decided on appeal to a court of last resort will govern the case

---

[5]    In its fifth issue, STORM also complains that "the trial court erred by not specifying the post-judgment rate of interest in the award of attorney's fees." Because the award of attorney's fees is reversed, we do not address this complaint. *See* TEX. R. APP. P. 47.1 (providing that "court of appeals must hand down a written opinion that is as brief as practicable but that addresses every issue raised and necessary to final disposition of the appeal").

50

throughout its subsequent stages." *Loram Maint. of Way, Inc. v. Ianni*, 210 S.W.3d 593, 596 (Tex. 2006) (citing *Hudson v. Wakefield*, 711 S.W.2d 628, 630 (Tex. 1986)). Although a decision rendered on an issue before the appellate court does not absolutely bar re-consideration of the same issue on a second appeal, application of the doctrine lies within the discretion of the court, depending on the particular circumstances surrounding the case. *Briscoe v. Goodmark Corp.*, 102 S.W.3d 714, 716 (Tex. 2003). Given that the only issue to be remanded to the trial court is the issue of attorney's fees, we do not exercise our discretion to reconsider our earlier ruling regarding venue.

We overrule STORM's fourth issue.

**Conclusion**

We reverse the portion of the trial court's judgment awarding attorney's fees, including conditional appellate attorney's fees, affirm the remainder of the judgment, and remand the case to the trial court for a new trial limited to the issue of the Oystermen's reasonable and necessary attorney's fees. *See* TEX. CIV. PRAC. & REM. CODE § 37.009; TEX. R. APP. P. 43.2; *see also Getty v. Perryman*, No. 14-17-00887-CV, 2019 WL 1768604, at \*6 (Tex. App.—Houston [14th Dist.] Apr. 23, 2019, no pet.) (mem. op.) (reversing portion of judgment awarding attorney's fees based on failure to segregate, affirming remainder of judgment, and remanding for new trial limited to issue of attorney's fees).

51

Richard Hightower
Justice

Panel consists of Chief Justice Radack and Justices Hightower and Adams.